**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE:<br><br>CENTRAL GROCERS, INC., *et al.*,<br><br>Debtors. | Chapter 7<br><br>Case No. 17-13886<br>(Jointly Administered)<br><br>Hon. Pamela S. Hollis |
| HOWARD B. SAMUELS, solely as chapter 7 trustee of the estates of CENTRAL GROCERS, INC., *et al.*,[1]<br><br>Plaintiff,<br><br>v.<br><br>THE PRODUCE CENTER, INC.,<br><br>Defendant. | <br><br>Adversary No. _____ |

**ORIGINAL COMPLAINT**

Howard B. Samuels, solely in his capacity as Chapter 7 trustee for the bankruptcy estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc., and SVT, LLC, pursuant to Federal Rule of Bankruptcy Procedure 7001, hereby brings this adversary proceeding against Defendant The Produce Center, Inc., and alleges as follows:

**JURISDICTION AND VENUE**

1. This adversary proceeding relates to the above-captioned bankruptcy case (the "Bankruptcy Case"), which was commenced on May 2, 2017 (the "Petition Date") under title 11 of the United States Code (the "Bankruptcy Code").

2. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b), as well as Internal Operating Procedure 15(a) of the United States

---

[1] The Debtors in these Chapter 7 cases, along with the last four of each debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

1

District Court for the Northern District of Illinois. This matter is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H), and (O).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4. Pursuant to Rule 9015-1 of the Local Rules of Bankruptcy Practice and Procedure for this Court, the Trustee states that he consents to the entry of a final order or judgment by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution with respect to any of the requests for relief set forth in this Complaint.

## PARTIES

5. Plaintiff HOWARD B. SAMUELS is the Chapter 7 trustee (the "Trustee") for the bankruptcy estates of Central Grocers, Inc. ("CGI"), Strack and Van Til Super Market, Inc. ("Strack"), and SVT, LLC (together with Strack, "SVT").

6. Defendant THE PRODUCE CENTER, INC. ("Defendant" or "Produce") is an Illinois Corporation with its principal place of business at 5820 N Milwaukee Ave., Chicago, IL 60646. Produce may be served with process through its registered agent, William D Dallas, at 20 N Clark St, Ste. 1103, Chicago, 60602.

## BACKGROUND

### A. CGI'S COOPERATIVE PROGRAM

7. CGI was a Chicago-based grocery cooperative with hundreds of members who operated grocery stores located in Illinois, Indiana, Iowa, Michigan, and Wisconsin. Members joined CGI to participate in its purchasing, dividend, equity, and lending programs.

8. Members were required to maintain "good standing" status to participate in CGI's programs. The requirements for good standing, along with the other rights and duties of membership, were set out in CGI's membership agreement (the "Membership Agreement"),[2] its Amended and Restated By-Laws (effective November 2012) (the "By-Laws"),[3] the Rules and

---

[2] Defendant's Membership Agreement is attached as Exhibit A.
[3] The By-Laws are attached as Exhibit B.

Regulations (effective March 2013) (the "Rules & Regulations"),[4] its Amended and Restated Articles of Incorporation (as amended 2015) (the "Articles"),[5] and its Member Loan Policy and Procedure (effective January 2010) (the "Loan Policy").[6] Each member signed the Membership Agreement, thereby agreeing to comply with the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy.

### 1. The Purchasing Program

9. Members in good standing were eligible to participate in CGI's purchasing program. Members received goods from CGI on account, and CGI received payment through automated clearing house ("ACH") transactions drawn from the member's bank account (the "Purchasing Arrangement"). Members were required to maintain deposit accounts ("Purchase Deposits") with CGI at amounts tied to their weekly buying volume. *See* Ex. A at 4; Ex. B at 27-28; Ex. C § 5. If a member failed to maintain an ACH account or failed to maintain appropriate Purchase Deposits, that member was deemed to be in violation of By-Laws and was no longer in good standing. *See* Ex. B at 28-29; Ex. C § 3. A member also lost its good standing status if payment to CGI was not made within the 12-day payment term. *See* Ex. B at 28-29; Ex. C §§ 3(d), 6.

10. To terminate purchasing from CGI, members were required to adhere to the procedure outlined in the By-Laws: a member either had to sell or close all its retail locations concurrently with termination or terminate at fiscal year-end and provide 60 days' written notice to CGI (the "Termination Procedure"). *See* Ex. B at 28. If a member failed to comply with the Termination Procedure or violated any other provision of the By-Laws, that member was no longer in good standing, and that member forfeited any amount otherwise owed by CGI to such member. *See id.* at 25, 28, 29.

---

[4] The Rules & Regulations are as Exhibit C.
[5] The Articles are attached as Exhibit D.
[6] The Loan Policy is attached as Exhibit E.

## 2. The Patronage Dividend Program

11. Members in good standing were also eligible to participate in CGI's patronage dividend program, which was governed by the By-Laws and the Rules & Regulations. At the close of each fiscal year, CGI's board of directors (the "Board") determined how much of CGI's profit to retain for costs, debt service, and any other reason deemed to be in the best interests of CGI. *See* Ex. B at 25, 27. The remaining profit, if any, was then distributed to members as a patronage dividend. If a member failed to maintain good standing or adhere to any provision of the By-Laws, including the Termination Procedure, it forfeited all rights to patronage dividends. *See* Ex. B at 25, 29.

12. Members received their share of a patronage dividend either as a distribution of cash, stock, and credit at the end of the fiscal year, or as quarterly cash payments made in advance of the anticipated year-end dividend, with a final distribution of the balance as cash, stock, and credit at the end of the fiscal year.

13. On or about September 15, 2016, the Board authorized a $44.5 million patronage dividend, subject to final adjustments, for the fiscal year ending July 30, 2016 (the "2016 Patronage Dividend"). None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Patronage Dividend or any portion thereof. As noted above, the Board had broad discretion under the By-Laws to retain some or all of CGI's profits for costs, debt service, and any other reason deemed to be in CGI's best interests. In fact, when the Board authorized the 2016 Patronage Dividend, CGI was insolvent and had been since at least January 2016.[7]

14. Shortly after authorizing the 2016 Patronage Dividend, the Board learned that CGI had violated the liquidity covenants in its $150 million credit facility. In turn, CGI's lenders demanded—as a condition for not declaring a default on the credit facility—that CGI defer paying 30% of the 2016 Patronage Dividend until CGI achieved compliance with such liquidity covenants (the "Deferred Dividend").

---

[7] *See infra* Section C.

15. On or about October 13, 2016, the Board authorized the Deferred Dividend, thereby amending the 2016 Patronage Dividend so that CGI had no obligation to pay the Deferred Dividend until the company was able to make such payment without violating its liquidity covenants. CGI subsequently sent letters to its members, explaining that the Deferred Dividend had been approved and that 30% of each member's 2016 Patronage Dividend would be recorded solely for bookkeeping purposes in the member's deposit account. CGI's financial condition never recovered such that it could pay the Deferred Dividend and comply with the liquidity covenants.

### 3. The Allowance Dividend Program

16. Members also profited from CGI's participation in allowance programs with its vendors. CGI entered into contracts with its vendors whereby it would commit to purchase a certain amount of product and in return the vendor would provide CGI a rebate—called an allowance—on its purchases.

17. On October 27, 2016, while insolvent, CGI paid its members over $2,500,000 in dividends from profit it earned on vendor allowance programs (the "2016 Allowance Dividend"). None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Allowance Dividend.

## B. DEFENDANT'S PARTICIPATION IN CGI'S COOPERATIVE PROGRAM

18. Defendant executed the Membership Agreement, thereby becoming bound by that agreement, the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy. Defendant never resigned their CGI membership prior to the Petition Date.

### 1. Receipt of and Failure to Pay for Goods

19. As of the Petition Date, Defendant had received, but had not paid for, goods on account from CGI in the amount of $38,325.25 (the "Unpaid Receivable") and had no cash in its Purchase Deposit account. Defendant received and accepted the goods but cancelled its ACH

account before CGI could draw payment. Defendant then terminated purchasing from CGI by April 28, 2017, without adhering to the Termination Procedure.

20. Defendant's failure to remit payment for the Unpaid Receivable, failure to maintain an ACH account, and failure to terminate purchasing in accordance with the Termination Procedure constitute material breaches of the Purchasing Arrangement, the Membership Agreement, the By-Laws, and the Rules & Regulations.

21. Accordingly, Defendant (a) owes the Unpaid Receivable to CGI, (b) is no longer in good standing with CGI, (c) lost all rights to Patronage Dividends, and (d) forfeited any other amount owed to it by CGI.

### 2. Receipt of Avoidable Transfers

22. CGI transferred $31,866.90 of the 2016 Patronage Dividend to Defendant (the "Patronage Dividend Transfers") as indicated on the Patronage Dividend Transfer Schedule attached as Exhibit F-1.

23. CGI transferred $3,861.51 of the 2016 Allowance Dividend to Defendant (the "Allowance Dividend Transfer") as indicated on the Allowance Dividend Transfer Schedule attached as Exhibit F-2.

24. On May 31, 2018, the Trustee sent a demand letter to Defendant (the "Demand Letter"), demanding payment for the Unpaid Receivable and the Patronage Dividend Transfers.[8] Defendant did not remit payment to the Trustee.

### C. CGI'S INSOLVENCY

25. CGI was insolvent at the time of the 2016 Patronage Dividend, and at the time of each of the Patronage Dividend Transfers and the Allowance Dividend Transfers described above.

---

[8] The Demand Letter is attached as Exhibit G.

26. CGI suffered declining financial performance throughout 2015, 2016, and 2017. Although it did not file for bankruptcy until May 2017, CGI was doomed to fail long before then. A primary driver behind CGI's collapse was the declining condition of SVT—CGI's retail grocery subsidiary and largest customer. A decline in SVT's performance affected CGI in several important ways. It reduced the cash flow from SVT, reducing CGI's ability to pay its debts as they came due. It reduced the value of CGI's Class B stock, thereby reducing the incentive for grocery retailers to become or remain Members. And it reduced the amount of product that SVT purchased from CGI, thereby reducing the amount of product that CGI purchased from its vendors, which diminished CGI's buying power and made CGI less attractive to grocery retailers.

27. CGI's declining performance quickly became evident in its reported financial numbers. As to its income statement, CGI suffered a net loss of over $49 million for the fiscal year ending July 30, 2016. As to its balance sheet, CGI recognized a $28 million impairment charge against goodwill and a $39 million impairment charge against fixed assets for fiscal year 2016. The causes of the deterioration in CGI's financial condition that led to these year-end impairment charges were also present in early 2016.

28. Even with these impairments to its assets, CGI's balance sheet still overstated the company's financial condition from a fair market perspective. Given the likelihood that CGI would soon fail, certain contingent liabilities should have been recognized on the company's consolidated balance sheet in 2016, including a significant portion of the following liabilities: (a) approximately $95 million in unfunded pension withdrawal liability; and (b) approximately $120 million in lease liabilities. In addition to its liabilities being understated, certain of CGI's assets were overstated on its balance sheet. CGI's distribution center, for instance, was carried on its balance sheet at $89 million throughout 2016 but sold for only $61 million in July 2017.

7

29. The marketplace confirmed that CGI's assets were worth less than its liabilities long before CGI filed for bankruptcy. From August 2015 to April 2016, with the help of an experienced financial advisor, CGI marketed itself for a potential sale or merger, but failed to attract a viable offer that would pay off CGI's debts and return a profit to its shareholders. The Board should have pursued any transaction it could have achieved to reduce the ultimate loss to creditors, but the market itself had demonstrated that CGI's assets were worth less than its liabilities. When CGI abandoned these sale or merger efforts in April 2016, one Board member candidly expressed concern about CGI's survival, asking: "Is this Company beyond repair?"

30. CGI's lenders shared these concerns. During a September 2016 meeting with the company's management, CGI's lenders expressed "great concern as to the direction of the Company." Moreover, as discussed above, shortly after the Board authorized the 2016 Patronage Dividend in September 2016, CGI's lenders forced CGI to defer paying 30% of the dividend because paying the full 2016 Patronage Dividend put CGI in violation of its liquidity covenants.

### CAUSES OF ACTION

### COUNT ONE
### Turnover of Property
### Pursuant to 11 U.S.C. § 542(b) – Unpaid Receivable
### (Against Defendant)

31. The Trustee re-alleges the allegations set forth in the above paragraphs.

32. Defendant received goods on account from CGI in the amount of the Unpaid Receivable.

33. Defendant did not remit payment to CGI for the Unpaid Receivable.

34. CGI's bankruptcy estate (the "CGI Estate") is entitled to payment of the Unpaid Receivable plus costs, expenses, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

35. Defendant is in possession, custody, and/or control of the Unpaid Receivable.

36. The Unpaid Receivable constitutes a matured, payable on demand, valid and existing debt, due and owing by Defendant to the CGI Estate.

37. The Unpaid Receivable is property of the CGI Estate under 11 U.S.C. § 541(a), and thus subject to turnover pursuant to 11 U.S.C. § 542(b).

38. Accordingly, the Trustee seeks turnover of the Unpaid Receivable. In addition, pursuant to Article XV of the By-Laws and Section 13 of the Rules & Regulations, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred in recovering the Unpaid Receivable.

## COUNT TWO
### Breach of Contract
### (Against Defendant)

39. Pleading in the alternative to Count One, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

40. The Purchasing Arrangement is a valid and enforceable contract governed by the course of dealing between the parties, the By-Laws, and the Rules & Regulations.

41. Pursuant to the Purchasing Arrangement, Defendant received goods on account from CGI in the amount of the Unpaid Receivable.

42. CGI fully performed its obligations under the Purchasing Arrangement.

43. Defendant did not maintain an open ACH account to satisfy all amounts owed to CGI for goods purchased on account, and Defendant otherwise failed to remit payment.

44. The Trustee sent Defendant the Demand Letter.

45. Defendant failed to pay the Unpaid Receivable and thus materially breached the Purchasing Arrangement, the By-Laws, and the Rules & Regulations.

46. The CGI Estate is entitled to payment of the Unpaid Receivable.

47. As a result of its breach, Defendant has caused CGI to incur damages in an amount equal to, at least, the Unpaid Receivable plus costs, expenses, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

48. Accordingly, the Trustee seeks to recover these damages. In addition, pursuant to Section XV of the By-Laws and Section 13 of the Rules & Regulations, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred recovering the Unpaid Receivable.

### COUNT THREE
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – 2016 Patronage Dividend
### (Against Defendant)

49. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

50. On or within two years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

51. The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

52. CGI incurred this obligation for the benefit of Defendant.

53. CGI received less than reasonably equivalent value in exchange for incurring this obligation.

54. CGI was insolvent at the time of or as a result of incurring this obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI incurred this obligation.

55. Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

### COUNT FOUR
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Patronage Dividend Transfers
### (Against Defendant)

56. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

57. On or within two years before the Petition Date, CGI transferred the Patronage Dividend Transfers to Defendant.

58. The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

59. The Patronage Dividend Transfers were made to or for the benefit of Defendant.

60. CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

61. CGI was insolvent at the time of or as a result of the Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Patronage Dividend Transfers.

62. Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT FIVE**
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers**
**(Against Defendant)**

63. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

64. CGI had no obligation to make the Allowance Dividend Transfers.

65. If, however, CGI had an obligation to make the Allowance Dividend Transfers, that obligation was incurred on or within two years before the Petition Date.

66. If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of Defendant.

67. If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

68. If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur,

11

debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

69. Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT SIX
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers
### (Against Defendant)

70. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

71. On or within two years before the Petition Date, CGI made the Allowance Dividend Transfers to Defendant.

72. The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

73. The Allowance Dividend Transfers were made to or for the benefit of Defendant.

74. CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

75. CGI was insolvent at the time of or as a result of the Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Allowance Dividend Transfers.

76. Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT SEVEN
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – 2016 Patronage Dividend
### (Against Defendant)

77. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

12

78. On or within four years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

79. The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

80. CGI incurred this obligation for the benefit of Defendant.

81. CGI received less than reasonably equivalent value in exchange for incurring this obligation.

82. CGI was insolvent at the time of or as a result of incurring this obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the 2016 Patronage Dividend.

83. Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

**COUNT EIGHT**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Patronage Dividend Transfers**
**(Against Defendant)**

84. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

85. On or within four years before the Petition Date, CGI transferred the Patronage Dividend Transfers to Defendant.

86. The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

87. The Patronage Dividend Transfers were made to or for the benefit of Defendant.

88. CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

89. CGI was insolvent at the time of or as a result of Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or

13

believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Patronage Dividend Transfers.

90. Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

## COUNT NINE
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers
### (Against Defendant)

91. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

92. CGI had no obligation to make the Allowance Dividend Transfers.

93. If, however, CGI incurred an obligation to make the Allowance Dividend Transfers, that obligation was incurred within four years before the Petition Date.

94. If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of Defendant.

95. If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

96. If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

97. Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

### COUNT TEN
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers
### (Against Defendant)

98. The Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

99. On or within before the Petition Date, CGI made the Allowance Dividend Transfers to Defendant.

100. The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

101. The Allowance Dividend Transfers were made to or for the benefit of Defendant.

102. CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

103. CGI was insolvent at the time of or as a result of Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital. CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Allowance Dividend Transfers.

104. Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

### COUNT ELEVEN
### Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)
### (Against Defendant)

105. The Trustee re-alleges the allegations set forth in paragraphs 1 through 104.

106. The Patronage Dividend Transfers and the Allowance Dividend Transfers are subject to avoidance pursuant to 11 U.S.C. §§ 544(b), 547(b), and 548(a)(1)(B).

107. Defendant received the Patronage Dividend Transfers and the Allowance Dividend Transfers as the initial transferee.

108. Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trustee seeks to recover the value of the Patronage Dividend Transfer and the Allowance Dividend Transfers from Defendant.

### COUNT TWELVE
### Unjust Enrichment
### (Against Defendant)

109. Pleading in the alternative to Counts One through Eleven, the Trustee re-alleges the allegations set forth in paragraphs 1 through 30.

110. Defendant received benefits—at CGI's expense—in connection with the Purchasing Arrangement, the Loan Documents, and certain avoidable transfers. Specifically, Defendant received benefits associated with the Unpaid Receivable, the Patronage Dividend Transfers, and the Allowance Dividend Transfers.

111. Defendant has unjustly retained these benefits to CGI's detriment, even though the Trustee has attempted to recover these benefits through the Demand Letter.

112. Retention of these benefits by Defendant violates fundamental principles of justice, equity, and good conscience.

113. Accordingly, the Trustee seeks to recover the amount by which Defendant has been unjustly enriched.

### COUNT THIRTEEN
### Disallowance of Claims Pursuant to 11 U.S.C. § 502
### (Against Defendant)

114. The Trustee re-alleges the allegations set forth in paragraphs 1 through 113.

115. This count is asserted against Defendant to the extent that any claims have been filed by or scheduled on behalf of Defendant against the CGI Estate.

116. Defendant is a person or entity from which property is recoverable under 11 U.S.C. §§ 542 and 550 (the "Recoverable Property").

117. Defendant has not turned over the Recoverable Property to the CGI Estate.

118. Accordingly, pursuant to 11 U.S.C. § 502(d), the Trustee hereby objects to and seeks disallowance of any claims by Defendant against the CGI Estate. Moreover, pursuant to 11 U.S.C. § 502(j), the Trustee seeks reconsideration and disallowance of any claims by Defendant against the CGI Estate to the extent that such claims have been allowed by this Court.

## CONDITIONS PRECEDENT

119. All conditions precedent to the Trustee's claims for relief have been performed or have occurred.

## PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against Defendant as follows:

a. directing turnover of the Unpaid Receivable, plus costs, expenses, attorney's fees, and interest, or, in the alternative, awarding as damages the amount of the Unpaid Receivable, plus costs, expenses, attorney's fees, and interest;

b. avoiding the 2016 Patronage Dividend obligation;

c. avoiding the Patronage Dividend Transfers and directing that the value of the Patronage Dividend Transfers be paid to the Trustee;

d. avoiding any obligation to make the Allowance Dividend Transfers;

e. avoiding the Allowance Dividend Transfers and directing that the value of the Allowance Dividend Transfers be paid to the Trustee;

f. awarding recovery of unjust benefits and disgorgement of all ill-gotten gains;

g. disallowing any claims filed by or scheduled on behalf of Defendant against the CGI Estate;

h. reconsidering and disallowing any claims filed by or scheduled on behalf of Defendant against the CGI Estate;

i. awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

j. awarding reasonable attorney's fees and expenses, together with all costs of court; and

k. granting such other and further relief, at law or equity, as this Court deems just and proper.

Dated: August 13, 2018.                    Respectfully submitted,

                                           /s/ Leo Oppenheimer

    Eric D. Madden (admitted pro hac vice)
J. Benjamin King (admitted pro hac vice)
Leo B. Oppenheimer (admitted pro hac vice)
REID COLLINS & TSAI LLP
1601 Elm Street, 42nd Floor
Dallas, TX 75201
(214) 420-8900 (T)
(214) 420-8909 (F)
emadden@rctlegal.com
bking@rctlegal.com
loppenheimer@rctlegal.com

*Special Litigation Counsel to Howard B. Samuels, Chapter 7 Trustee for the estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc. and SVT, LLC*